THE STATE v. WALTER H. McGEE, Appellant.—83 S. W. (2d) 98.

Division Two, April 25, 1935.

*James M. Rader* and *Lillie Knight* for appellant.

*Roy McKittrick,* Attorney General, and *Frank H. Hayes,* Assistant Attorney General, for respondent.

1086

BOHLING, C.—Walter H. McGee was found guilty of kidnaping Mary McElroy for ransom. The verdict of the jury assessed his punishment at death. He appeals from the judgment thereon.

The members of the McElroy household consisted of Judge Henry F. McElroy, his daughter Mary, his son Henry F., Jr., and the housekeeper Heda Christensen. They resided at the family home in Kansas City, Jackson County, Missouri. On May 27, 1933, about eleven o'clock in the forenoon, the daughter and housekeeper were alone at the home, the daughter bathing in a bathroom on the second floor of the residence. The front door was open but the screen was locked. Answering the doorbell, the housekeeper was informed by the man at the door (she identified him as appellant at the trial) that he had a package for Miss McElroy. There was an automobile parked in front of the residence, with another man, later identified as Clarence Stevens, at the wheel. The housekeeper conveyed the message to Miss McElroy, who refused to accept the package. Upon being informed Miss McElroy would not accept the package, appellant took a gun from underneath his coat and, threatening to shoot through the door unless it was opened, he and Stevens, each flourishing guns, entered the house. Inquiring as to who was home and the whereabouts of Miss McElroy, the housekeeper informed them she was bathing. They told the housekeeper they were kidnapers, wanted Miss McElroy, and forced the housekeeper to accompany them upstairs. Miss McElroy, hearing the commotion and the approach of a man's footsteps, jumped out of

the bathtub and succeeded in locking the bathroom door just as someone took hold of the knob. After appellant and Stevens threatened to shoot through the door and kill Miss McElroy a robe was obtained and Miss McElroy came out. She was informed she was being kidnaped for ransom, was permitted to dress (appellant and Stevens guarding the two doors of her room), and ordered to the waiting automobile, where she was compelled to lie on the floor between the front and rear seats, with a blanket over her.

While Miss McElroy was dressing, appellant, who acted as spokesman throughout, instructed the housekeeper to inform Judge McElroy they wanted $60,000 and to keep the press and police out of it or they would demand $100,000 and would not return "Mary." He also threatened death if any attempt be made to identify them. Judge McElroy was informed of the events as soon as the automobile departed, and, proceeding home immediately, made arrangements for the necessary funds and the immediate delivery of any mail addressed to him.

After traveling for about twenty minutes Miss McElroy was taken from the automobile and confined in a small fruit cellar located in the basement of a house near Shawnee, Kansas. This house was occupied by Clarence Click and Lucille Cates, the former wife of appellant. Here a handcuff was placed on Miss McElroy's left wrist, and, by means of a short chain, was made fast to an iron ring protruding from the wall of the fruit cellar. Soon thereafter thumb prints of Miss McElroy were taken on three pieces of paper, and, using one of these for the first sheet, appellant instructed Miss McElroy to write her father, advising him that she had been kidnaped and was being held for $60,000 ransom; that if the matter was reported to the police or newspapers the demand would be for $100,-000 and she would be killed; that any letter without her thumb prints would be counterfeit; that the money should be in currency, twenty thousand each in twenty, ten and five dollar bills; that, if the money was marked, her father and her brother Henry would be killed; and that he would hear further. Miss McElroy wrote the letter, using her own words as instructed. Appellant told Miss McElroy he was the leader of a gang of twelve; that they had planned to kidnap her brother but were unable to locate him; that they had taken an oath to avenge any of the gang who might be caught, and that although they might get some of the gang, they would never get all of them. About five-thirty appellant and Stevens had Miss McElroy write a second letter, appellant instructing her to tell her father to be home the next morning and they would get in touch with him; that he should have used currency; that when they called him to meet them he should come in his car alone, and to again inform her father if the story be given the police or press they would all be killed. During Miss McElroy's confinement she was under

guard practically all the time, one George McGee so acting. Her captors were armed and exhibited their weapons in her presence, including what they said was a machine gun.

Judge McElroy received his daughter's first letter about seven-thirty in the evening and the second about two hours later. About nine o'clock the next morning, he received the first telephone call. The conversation related to the amount of the ransom, the kidnapers asking $60,000 and Judge McElroy stating he could make arrangements for $30,000. He was informed he must meet their terms if he expected to see his daughter again. A second telephone conversation took place about eleven o'clock, resulting in an understanding that $30,000 was to be paid for Miss McElroy's release. A third telephone call came about one o'clock, in which Judge McElroy was instructed to go to a certain mail box for further instructions; and, upon Judge McElroy's request, his son was permitted to accompany him. Judge McElroy and his son, taking with them $30,000 in currency, composed of $25,000 in $100, $50, $20, $10 and $5 bills, and five $1,000 bills, drove to the mail box as directed, and after following typewritten instructions received at different places, finally parked on Munice Road, just out of Kansas City, Kansas. In the meantime, appellant and Stevens had Miss McElroy again write her father, informing her they had agreed to accept $30,000 and instructing her to tell her father if the money be marked or the story given to the press or police they would all be killed.

Judge McElroy's car had been parked only two or three minutes when appellant and Stevens drove up. Appellant came to Judge McElroy's car on the driver's (son's) side, the lower part of his face covered with a handkerchief. This handkerchief soon dropped down and appellant did not put it up. Appellant handed Judge McElroy his daughter's third letter, bearing her thumb print. After some discussion concerning the $1,000 bills, appellant calling Stevens to the car, the money was accepted. Appellant and Stevens had guns, and Judge McElroy was warned, as he had been in the letters and telephone conversations, not to give the matter to the newspapers or the police; that there were a number of men in the gang and they had plenty of weapons, and, although they might get some of them, so long as one remained living, the others would be avenged by killing his entire family.

About three o'clock that afternoon, appellant informed Miss McElroy she was to be released. She was blindfolded, placed on the floor of an automobile, between the seats, and, after traveling for about ten minutes, released near the Milburn Golf Club house.

Lucille Cates testified that appellant instructed everyone to wear smoked glasses when they went to the basement and stated that they were holding the McElroy girl in the basement for ransom; that she went to the basement but only saw George McGee; that, just

before appellant and Stevens left in the afternoon about three o'clock, she looked in the basement and observed, among other things, the feet and hem of the skirt of a woman; that appellant, Stevens, Click and George McGee were present at the house while the company was in the basement; and that appellant gave her $1,000 in currency the day the girl was released.

On June 2, 1933, appellant was arrested at Amarillo, Texas. At the time of his arrest, appellant had in his possession approximately $9,000 in currency, and several weapons.

Appellant offered no evidence.

Other facts, pertinent to the issues raised, will be mentioned in the course of the opinion.

I. Several assignments of error relate to the action of jurors. On the hearing of the motion for new trial evidence pro and con was introduced on these issues.

Section 3734, Revised Statutes 1929 (Mo. Stat. Ann., p. 3272), provides: "The court may grant a new trial . . . second, when the jury has been separated without leave of the court, after retiring to deliberate upon their verdict, or has been guilty of misconduct tending to prevent a fair and due consideration of the case. . . ." Section 3678, Revised Statutes 1929 (Mo. Stat. Ann., p. 3226), Laws 1925, page 196, section 4021, provides: "In all felony cases the trial court may, of its own motion, or when requested by the attorney for the State or for the defendant, place all jurors found by the court to be competent to sit in the trial of the cause in the custody of an officer or officers of the court until the entire panel shall have been made up and the peremptory challenges shall have been made and the jury sworn to try the cause. . . ." Under this section the trial court is vested with discretion to permit the jury to separate until the jury is sworn to try the cause; and we have held, notwithstanding the objections of counsel for a defendant in a capital case, in the absence of any showing of prejudice resulting from the separation of the panel until the challenges are properly made, we must assume that the court properly exercised its discretion. [State v. Fox (Mo.), 300 S. W. 820, 821(5).] Section 3682, Revised Statutes 1929 (Mo. Stat. Ann., p. 3235), provides: "With the consent of the prosecuting attorney and the defendant, the court may permit the jury to separate at any adjournment or recess of the court during the trial in all cases of felony, except in capital cases. . . ." Under this section the jurors "may . . . disperse and go to their several homes or about their business." [State v. Shawley, 334 Mo. 352, 380, 67 S. W. (2d) 74, 88.] In State v. Todd, 146 Mo. 295, 300(3), 47 S. W. 923, 924(3), the trial jury, after the peremptory challenges, entered the box, and the court, upon giving the usual admonition but prior to their

being sworn to try the case, excused them, without the consent of the defendant, for about two hours, and·they mingled with many people of the town. The rule, notwithstanding objections interposed upon the return of the jury, that in the absence of an affirmative showing upon the part of the State that the jurors were not subject to improper influence the cause would be remanded (which has "reference to a separation of the jury during the progress of the trial, and not before") was held not applicable. State v. Orrick, 106 Mo. 111, 124(8), 17 S. W. 176, 179(7), is one of the leading cases interpreting Sections 3682, 3683, 3734, supra (Secs. 1909, 1910, 1966, respectively, R. S. 1879). The issue in the Orrick case related to misconduct pending the trial and prior to deliberation. After stating Missouri had followed the rule that the separation of a jury, in a criminal case, was not sufficient to authorize a reversal of a judgment, unless it appeared that improper influence had been exerted, or there was just ground for suspecting such influence (106 Mo. l. c. 125), and, that now Section 3682, as applicable to capital cases, was declaratory of the common law, and the effect of a separation upon the verdict before final submission of the case to the jury must be determined by some reasonable rule (106 Mo. l. c. 127), the court, discussing the several rules, holds (l. c. 128):
"But, inasmuch as the rule forbidding the separation of jurors, in capital cases, has been declared by statute; and, in view, too, of the other changes effected by the other sections referred to, we feel satisfied that the more stringent rule should be applied, in case the requirements of Section 1909 (now Sec. 3682) are disregarded, and that a separation before the jury retires to deliberate upon their verdict will be grounds for a new trial, unless it be shown affirmatively by the State that the jurors were not subject to improper influence."
As the alleged misbehavior on the part of the jury in the instant case occurred prior to their retirement for deliberation upon their verdict, that portion of Section 3683, Revised Statutes 1929 (Mo. Stat. Ann., p. 3236), relating to the isolation of the jury, as well as cases like State v. Asbury, 327 Mo. 180, 36 S. W. (2d) 919, and State v. Hayes, 323 Mo. 578, 583(1), 19 S. W. (2d) 883, 886(2) (holding, under Sections 3683 and 3734, supra, that "where the jurors separate, without the permission of the court, unattended by any officer, after the cause has been submitted to them to deliberate upon a verdict, where an opportunity was afforded for outside or sinister influences" forestalls "inquiry as to whether any outside or sinister influences was·asserted on them, thus requiring the courts to grant defendant a new trial"), do not govern the issues presented by the instant record, which fall under Sections 3678 and 3682, supra, and decisions applying or interpreting said sections.

(a) During the progress of the trial, some of the jurors desired to purchase cigars and one of the officers accompanied them

to the cigar stand in the lobby of the hotel where they were quartered while another officer remained with the others. The distance between two groups of jurors was estimated from twenty-five to forty feet. The officer in charge of the group not desiring to make any purchases had all the jurors within his view at all times. At another time, the court permitted some of the jurors to telephone their families for clothing, etc. This occurred under the instructions of the court. The room from which they telephoned was a corner room of the courtroom, within five feet of the jury box and twenty feet of the judge's bench. A deputy sheriff was stationed inside the room where the telephoning occurred and another deputy sheriff at the entrance in the courtroom to prevent others from entering the room. The jurors were permitted to enter the room to telephone one at a time. The occurrence was within the observation of anyone in the courtroom. As it thus appears that in each instance the jurors were at all times in the custody and under the supervision and surveillance of an officer of the court, and as the issue of a separation of the jury is to be determined by some reasonable rule (State v. Orrick, supra), we think there was no such separation of the jury as falls within the prohibition of the statutes. [See State v. Shawley, 334 Mo. 352, 379(14), 380, 67 S. W. (2d) 74, 88(31).]

(b) Error is alleged in that while the jurors were at the cigar stand two of them were observed reading the newspapers. A party in the lobby of the hotel testified on the hearing of the motion for new trial that to his best knowledge two of the jurors were looking down at papers on the cigar stand; that he could not say they were reading the paper; that he did not know what issue of the paper it was; and that no juror picked up any paper. The evidence of the officers in charge of the jury was that there was no newspaper on the cigar stand, and that no juror, at any time during the trial, was permitted to read any newspaper. It thus appears that the court, after hearing the evidence, did not act in an arbitrary manner in permitting the verdict to stand; and, under such circumstances, following a well-established rule with reference to matters of fact, this court will not interfere. State v. Taylor, 134 Mo. 109, 161(e), 35 S. W. 92, 105(12e), states: "Relative to the alleged separation of the jurors and other alleged misconduct, the previous forming and expression of opinions by several of them, it is enough to say that the whole matter of this paragraph was examined by the lower court upon affidavits pro and con and that court having ruled that the verdict should stand, we will not interfere with such ruling unless upon grounds the most clear and reasons the most manifest." [See State v. Howard, 118 Mo. 127, 136 (3), 24 S. W. 41, 43(3b); State v. Rasco, 239 Mo. 535, 587, 144 S. W. 449, 464(34); State v. Sebastian, 215 Mo. 58, 88(4), 114 S. W. 522, 531(4); State v. Cushen-

berry, 157 Mo. 168, 183(6), 56 S. W. 737, 743(6), State v. Howell, 117 Mo. 307, 342(4), 23 S. W. 263, 273(4).]

(c) Appellant assigns error on the ground the deputy sheriff should have telephoned the families of such jurors as used the telephone instead of permitting the jurors to telephone. In addition to the facts heretofore set forth in connection with this incident, the testimony showed that the officer at the entrance of, as well as the officer inside, the room could hear the conversation of the jurors; and that every conversation was very short and related to personal matters, such as a request for clean clothing, etc. They did not hear the party with whom the juror talked. We think the assignment not well taken for several reasons, among which, are:

First. The record does not affirmatively show that appellant did not have full knowledge of the entire transaction. It has been held essential that an affirmative showing be made that an appellant and his counsel were ignorant of misconduct on the part of jurors until after the trial where such misconduct is first presented in the motion for new trial, as is the situation in the instant case. State v. Barrington, 198 Mo. 23, 93, 95 S. W. 235, 257(6), states: "Upon this assignment of error (misconduct of one of the jurors) it will suffice to say that the record fails to disclose at what time the knowledge of such misconduct complained of came to appellant or his counsel. *This is fatal to the contention urged by appellant upon this proposition.*" (Italics ours.) Speaking of a remark made by one of the panel while peremptory challenges were being made and unknown to counsel until after the trial, State v. Burns, 85 Mo. 47, 50, states: "If it was heard by defendant himself, and constituted any objection to Tacke, then defendant was guilty of inexcusable negligence in not communicating the fact to his counsel, so that proper steps could be taken." [See State v. Trainer, 336 Mo. 620, 80 S. W. (2d) 131, and cases there cited; State v. Gilmore, 336 Mo. 784, 81 S. W. (2d) 431; State v. Richardson, 194 Mo. 326, 337, 92 S. W. 649, 652(5); State v. Rasco, 239 Mo. 535, 584(13), 144 S. W. 449, 464(33, 34).] Reasons for the rule are fully stated in the cases cited and referred to. The fact that the court had knowledge of the incident did not relieve appellant of his duty under the law to make timely and proper objections, or a showing that information of the alleged misconduct was first acquired after trial or the reason for failure to earlier present the issue. The duty in this respect, we think, is the same as exist for the making of timely objections and the saving of timely exceptions to the admission or exclusion of evidence, or the giving of instructions. The observations here made with reference to the necessity of a showing of the time when knowledge of misconduct on the part of jurors was first acquired by an appellant is applicable to all such issues in the instant case, as we

are unable to find any affirmative showing as to appellant's information on any issues in the record before us.

Second. While the jurors were telephoning, counsel for appellant, who had left his hat in the room, came for it and was prevented from entering by the deputy at the entrance, who secured counsel's hat for him. If, as disclosed by the testimony, the occurrence was within the observation of anyone in the courtroom, and the jurors were permitted to enter only one at a time, and the outside deputy was able to hear the conversations, we do not perceive how it can be successfully maintained that this alleged misconduct of the jurors first came to the knowledge of counsel for appellant after the return of the verdict into court. If counsel had information of the occurrence prior to the return of the verdict and delayed presenting the issue until the filing of the motion for new trial, the point is considered waived. [State v. Gilmore, supra; State v. Rasco, supra.]

Third. Upon the return of the verdict into court, the jury were polled at the request of appellant. Although at first refusing, the court, at the request of appellant, inquired of the jury, among other things, if anyone had talked to them about the case outside the courtroom in the hearing of the case or while they were in the juryroom in deliberation or at any time. Each juror answered no. Appellant, having requested the information of the jury, absent any contradictory testimony, should be bound by the answers.

(d) The trial jury was not selected until the second day. On the first day the court, after giving the usual admonitions, including instructions not to read the newspapers, permitted the jury to separate. Appellant assigns error in that the daily newspapers of the city issued on said first day carried articles with headlines concerning the trial, and by reason thereof the jury were prejudiced against appellant. Appellant also asserts that the jury was prejudiced against appellant by reason of being permitted to hear news flashes over the radio. On the hearing of the motion for new trial there was no showing that any juror read any of the articles complained of; and, the uncontroverted evidence was that the trial jury did not hear any news flash over a radio at any time after their selection until their discharge. As the assignments do not prove themselves they are without merit. [State v. Yowell, 331 Mo. 716, 722(8), 55 S. W. (2d) 991, 994(8).] Other reasons might be advanced against the assignments; such as that appellant, on the morning of the second day, could have, but did not, make inquiry of the array concerning the matters complained of; and that there is no affirmative showing when appellant and his counsel first acquired knowledge of such matters.

While we need not stress the necessity for precautions on the part of courts and officers of courts to prevent any separation or misconduct on the part of jurors, the safer practice, wherever possible,

would be for the court to have the jurors make their requests in open court and then have some official carry out the request, if proper, and avoid the possibility of prejudicial error. [State v. Malone, 333 Mo. 594, 602, 609, 62 S. W. (2d) 909, 912(6), 913(18); disapproving a brief telephone conversation although passing off on another issue; and State v. Shawley, 334 Mo. 352, 378, 67 S. W. (2d) 74, 87, discussing numerous actions of jurors during their deliberation upon their verdict.]

II. Appellant's assignment challenging the array of jurors on account of political affiliations is without merit for a number of reasons, among which are: Any challenge to the array should be timely made *in writing*. This was not done. [State v. Garrett, 285 Mo. 279, 288, 226 S. W. 4, 7(5), and cases cited; State v. Brennan, 164 Mo. 487, 504, 65 S. W. 325, 329(1).] After proceeding with challenges to the polls, appellant was precluded from thereafter challenging the array, State v. Taylor, 134 Mo. 109, 143, 35 S. W. 92, 99(i); State v. Clark, 121 Mo. 500, 513, 26 S. W. 562, 566(3); and appellant's presentation of the issue for the first time in the motion for new trial failed to preserve it for review, State v. Garrett, 285 Mo. 279, 287(4), 226 S. W. 4, 7(4); State v. Grant, 152 Mo. 57, 71, 53 S. W. 432, 435(6). The record fails to disclose any timely challenge to the array—verbal or in writing; or any objection (or exception) to the polls involving this issue. Affiliations with political parties constitute neither a qualification nor disqualification for jury service. [State v. Campbell, 210 Mo. 202, 231(3), 109 S. W. 706, 714(3).] See statutory provisions on qualifications of jurors.

III. Two firearms taken from appellant's possession at the time of his arrest were introduced as exhibits. The assignment against their admission in evidence is not well taken, because: The arresting officer positively identified each gun; and testified that appellant had one of the guns on his person and the other in his suit case at the time of his arrest; and that appellant was slow in complying with his command to "get them up and keep them up." They were then admitted as exhibits. All this occurred without objection. The objection thereafter lodged against the admissibility of the exhibits failed to preserve the issue for review. [State v. Glazebrook (Mo.), 242 S. W. 928, 931(5); State v. Reed, 237 Mo. 224, 229, 140 S. W. 909, 910(6, 7); State v. Ferguson (Mo.), 183 S. W. 336, 337(3); State v. Sinovich, 329 Mo. 909, 916, 46 S. W. (2d) 877, 880(10); State v. Stogsdill, 324 Mo. 105, 126(4), 23 S. W. (2d) 22, 29(17).] The exhibits were competent as tending to show the circumstances attending appellant's arrest. [State v. Hart, 309 Mo. 77, 89, 274 S. W. 385, 388(8). See, also, State v. Mangercino, 325 Mo. 794, 802(3), 30 S. W. (2d) 763, 765(2); State v. Ball, 321 Mo. 1171, 14 S. W. (2d) 638, 643(5).]

■ IV. (a) Appellant assigns error in that the court permitted Judge McElroy to identify the voice he heard over the telephone as that of appellant. Judge McElroy had several telephone conversations with a party and a short time thereafter met and talked with appellant. He positively identified the voice over the telephone as that of appellant. The admissibility of such evidence, founded upon the sense of hearing, depends upon the identification of the speaker; its weight and value upon the opportunity the witness has had for the identification. State v. Berezuk, 331 Mo. 626, 633, 55 S. W. (2d) 949, 952(4), states: "If the witness recognizes the voice of the person calling him, of course, the telephone conversation is admissibile." [Meyer Milling Co. v. Strohfeld, 224 Mo. App. 508, 515, 20 S. W. (2d) 963, 967(6), certiorari quashed, State ex rel. Strohfeld v. Cox, 325 Mo. 901, 30 S. W. (2d) 462; Dorchester Trust Co. v. Casey, 268 Mass. 494, 167 N. E. 915, 71 A. L. R. 1, and note 1. c. 36, IVa.]

(b) A like complaint is lodged against Miss McElroy's identification of the voice outside the bathroom door as that of appellant. As soon as she stepped out of the bathroom appellant talked to her and she had a number of conversations with him thereafter. The evidence was clearly admissible. [State v. Bell (Mo.), 300 S. W. 504, 505(1); State v. Hall (Mo.), 7 S. W. (2d) 1001, 1004(2); Mack v. State, 54 Fla. 55, 44 So. 706, 14 Ann. Cas. 78, 13 L. R. A. (N. S.) 373, and note; State v. Vanella, 40 Mont. 326, 106 Pac. 364, 20 Ann. Cas. 398, 401(4), and note.] This issue is not here for review as appellant failed to timely object to the question—the objection coming after the witness had answered. See authorities on this issue under III, supra.

■ V. Several assignments relate to the introduction of certain photographs as exhibits. The exhibits objected to were photostatic copies of certain letters and photographs of the basement where Miss McElroy was confined.

(a) An assignment common to a number of the exhibits is that the photograph was not made in the presence of the witness identifying the exhibit. The fact that the photograph represents the witness' observation, rather than that the witness made the photograph or was present when it was taken, is the essential factor determining its admissibility. Hughes v. State, 126 Tenn. 40, 68, 148 S. W. 543, 550(3-6), Ann. Cas. 1913D, 1262, 1270, collating some of the cases, states: "The fact that the photograph was not proven by the photographer who made it was immaterial. [Citing cases.] The accuracy of photographs may be proven by anyone who knows the fact. [Citing cases.] They are admissible in evidence when shown to be reasonably accurate representation of the place or thing in question, to help the jury in understanding the testimony of the

witnesses. [Citing cases.] They belong in the law of evidence to the same class as models, maps, and plans. It does not affect the admissibility of such a representation, if it be shown that it is incorrect in some particulars, but only its weight. [Citing cases.]" State v. Jones, 48 Mont. 505, 520, 139 Pac. 441, 447, states: "That it [a photograph] is a fair and correct representation may be shown by the person who made it or by any competent witness." In State v. McBride (Mo.), 12 S. W. (2d) 46, 50(12), a photograph found in defendant's room and stated by the State's witnesses to resemble the woman with defendant at the time of the offense (also identified as the photograph of the wife of defendant by one of defendant's witnesses) was held admissible. [See, also, 16 C. J. 744, sec. 1528; 2 Wigmore on Evidence (2 Ed.), sec. 794(3).]

(b) Another assignment common to several of the exhibits is to the effect a change in the conditions existed. Photographs and diagrams purporting to reconstruct the surrounding conditions at the time of an offense are admissible in evidence. [See, in particular, State v. O'Reilly, 126 Mo. 597, 603, 29 S. W. 577, 578(3); State v. Cummings, 189 Mo. 626, 645, 88 S. W. 706, 712(9).] Inaccuracies therein, such as are here questioned, are generally more properly matter for impeachment, going to the weight, rather than the competency of the evidence. In holding error was committed in excluding photographs of an automobile, with explanations as to any change in condition, Young v. Dunlap, 195 Mo. App. 119, 125, 190 S. W. 1041, 1044(10), states: "There were some changes necessary to get the machine home, but these points of differences could be made the basis for cross-examination, thus enabling the jury to give the proper weight to the evidence." The changes developed by the testimony in the instant case related to details. For instance: When Miss McElroy identified a photograph of the fruit cellar in which she had been confined, she stated she had not noticed a window shown in the photograph. The owner of the premises also identified the same exhibit, but stated a certain iron ring shown protruding from the wall had been placed there subsequent to her last visit prior to the kidnaping. The owner of the building limited her identification of certain photographs of the basement to the permanent structure thereof and disclaimed knowledge of certain personal property shown in the photographs. Under such circumstances, the photographs being identified by witnesses familiar with the object photographed, accompanied by the necessary explanations concerning details, the exhibits were properly admitted. [See, also, Hunt v. St. Louis, 278 Mo. 213, 224(2), 211 S. W. 673, 676(3); Johnson v. Kansas City (Mo. App.), 272 S. W. 703, 704(2, 3); Smith v. Wilson (Mo. App.), 296 S. W. 1036, 1040(7).]

(c) The photographs identified by the owner of the building as representing the construction of the basement had been previously

identified by Miss Cates as fair and reasonable representations of the basement where Miss McElroy was confined, and admitted in evidence. Miss Cates occupied the house at the time of and prior to the kidnaping with one of appellant's companions. The appellant did not cross-examine her to establish inaccuracies or differences, if any, that might have existed in the condition of things while Miss McElroy was confined in the basement and conditions as disclosed by the photographs. In view of the witness' knowledge of the premises and her identity of the photographs, the exhibits were properly admitted under the record made.

(d) The photostatic copies of letters written under the instructions of appellant by Miss McElroy to her father were properly admitted. Judge McElroy testified he delivered the letters in question, together with all other communications received by him from the appellant and his companions, to appellant, at appellant's request at the time he paid appellant the ransom. Notice was served upon appellant, in the presence of his counsel, to produce the originals. In one instance appellant's counsel stated appellant never had the letters. He also stated it was an impossibility to produce the originals as appellant did not have them. Miss McElroy identified the photostatic copies as exact copies of the letters written by Miss McElroy to and received by Judge McElroy. The exhibits were offered in connection with Miss McElroy's testimony, at which time the objection was interposed. Thereafter, while Judge McElroy was on the stand he testified concerning the receipt of the original letters, and that they were photographed in his presence. Thereupon, counsel for appellant, upon being asked, stated he had no objection to the exhibits. We think this waived the issue. Further: If appellant never had the letters testimony concerning them would have been proper without a formal demand, as "a formal notice to produce the letter . . . could not have served any purpose." [State v. Koch, 322 Mo. 106, 16 S. W. (2d) 205, 210(3).] If appellant received the originals from Judge McElroy and failed or refused to produce them on request, a sufficient basis for secondary evidence of their contents was established. [State v. Smith (Mo.), 252 S. W. 663, 665(5).] In State v. Barrington, 198 Mo. 23, 98(10), 95 S. W. 235, 239(10), a letter written by a witness at the suggestion of the accused was lost, and it was held that a copy thereof made by the police at the time they obtained a statement from the witness and identified by him as an exact copy of the letter written by him was admissible. Under similar circumstances, the same rule should be equally applicable to a photostatic copy of a letter. [See Fuller v. Robinson, 230 Mo. 22, 56(9), 130 S. W. 343, 353; 16 C. J. 744, sec. 1528.]

VI. Judge McElroy testified that certain money exhibited to him and the ransom money delivered by him to appellant was of like kind and denominations. He did not undertake to further identify the money. This is attacked on the ground that the exhibited money was not identified.

Judge McElroy received his daughter's letters, written at the dictation of appellant, instructing him to procure only used currency in denominations of twenty, ten and five dollars, and have the money in packages of $1,000. He testified that "$25,000 of the ransom money was in hundreds, fifties, twenties, tens' and fives and $5,000 was in five $1,000 bills;" that he delivered the $30,000 ransom money and told appellant "there is $25,000 in small currency and $5,000 in $1,000 bills;" that appellant and Stevens, after objecting to the $1,000 bills, finally accepted the money. Miss McElroy testified that, just prior to her release, appellant told her ". . . that Dad included five one thousand dollar bills. . . ." The foregoing evidence went in without objection or exception. Judge McElroy also stated that he personally did not handle the money; that it was handled at his request; that he requested the taking of the serial numbers; that he was much distressed at the time; and that the serial numbers of every bill of the $30,000 in currency was taken at his home in the forenoon of the day the money was delivered to appellant. We think the inference from this testimony is that Judge McElroy, although he did not personally handle the money and take the serial numbers of the bills, had knowledge of the kind and denominations, outside of information given him by others, of the currency he delivered to appellant. This was the extent of his identification of the money; and such identification has been considered admissible. [See Gady v. State, 83 Ala. 51, 3 So. 429; State v. Clark, 27 Utah, 55, 74 Pac. 119.] It is not essential to the admissibility of evidence on the identity of persons and things that the identification be positive so long as it is based on facts within the witness' knowledge. [State v. Blackmore, 327 Mo. 708, 715, 38 S. W. (2d) 32, 34(2), and cases cited.] At the time of appellant's arrest at Amarillo, Texas, on June 2, 1933, he had five $1,000 bills hidden in his luggage, and approximately $3,000 in currency in a money belt and other money on his person. The serial numbers of this currency were taken, and this money, exhibited to Judge McElroy, was identified by officers from Amarillo as the money in appellant's possession upon his arrest. Appellant stated to the officers at Amarillo that the money in question was kidnap money, and one witness, although not clear, was of the opinion appellant stated it was the McElroy kidnaping money. The subject matter of Judge McElroy's knowledge of the ransom money was not developed further on cross-examination by appellant; and no motion to strike the

testimony appears in the bill of exceptions. We think the weight and value of his testimony on this issue was for the jury.

■ VII. Appellant assigns error in the exclusion of testimony asserted to affect the credibility of Judge McElroy as a witness. Appellant sought to inquire of this witness concerning his knowledge of the operation of slot machines in Kansas City and his authorship of a certain article pertaining thereto in one of the newspapers. The evident purpose of the inquiries was to show that the operation of slot machines is in violation of the law and, in the event of an affirmative answer as to his authorship, to offer the article in evidence to show the witness' views thereon. Practically the entire article is an expression of opinion, as distinguished from statements of fact. The article did not relate to the witness' history. Thereafter, in response to a question the witness stated that he was not interested as a partner with another named party in the operation of slot machines, and, upon inquiry of appellant's counsel, the court was informed there were no other questions along that line. Assuming the witness would have answered in the affirmative, insofar as the article expressed the opinion of the witness it would not have been competent. [State v. Nave, 283 Mo. 35, 39(1), 222 S. W. 744, 745(1); State v. Aurentz (Mo.), 263 S. W. 178, 180(2).] The general rule that for the purpose of attacking a witness' credibility, he may be cross-examined on irrelevant matters even though tending to expose him to disgrace so long as the examination does not expose him to a criminal charge, is subject to the limitation that the nature and extent of such cross-examination rests largely within the discretion of the trial court. [Wendling v. Bowden, 250 Mo. 647, 698, 161 S. W. 774, 789; Barraclough v. Union Pac. Railroad Co., 331 Mo. 157, 163(1), 52 S. W. (2d) 998, 1000(1); State v. Baugh (Mo.), 217 S. W. 277, 281(5). And see State v. Stegner, 276 Mo. 427, 439, 207 S. W. 826, 830(15-17), and cases cited; State v. Loahmann (Mo.), 58 S. W. (2d) 309, 311(4); Asadorian v. Sayman (Mo. App.), 282 S. W. 507, 511(9).] This limitation to the rule is recognized in State v. Long, 201 Mo. 644, 657, 100 S. W. 587, 590(3), and State v. Potts, 239 Mo. 403, 413, 144 S. W. 495, 498(5, 6), cited by appellant. The inquiries in the instant case were on collateral matters, having no direct bearing upon or tending to prove or disprove any issue of vital importance in the case, or the witness' attitude upon the merits of the case or toward the defendant; and the trial court's action was within the rightful exercise of its discretion.

■ VIII. Another assignment relates to improper remarks of counsel for the State in the argument to the jury. The record fails to show any objections made or exceptions saved. The issue, therefore, must be considered waived (State v. DeWitt, 191 Mo. 51, 58, 90 S. W. 77, 79), not being preserved for review. [State v. Seward

(Mo.), 247 S. W. 150, 154(12); State v. Copeland, 335 Mo. 140, 71 S. W. (2d) 746, 751(8); State v. Eason, 322 Mo. 1239, 1249(6), 18 S. W. (2d) 71, 76(8).]

IX. Appellant contends the penalty assessed is excessive and the result of passion and prejudice. We find no proof of passion or prejudice in the record, unless it be the penalty imposed; and the allegation in the motion for new trial, absent proof, is unavailing. [State v. Golden, 330 Mo. 784, 792(5), 51 S. W. (2d) 91, 94 (5); State v. Preslar, 318 Mo. 679, 686(4), 300 S. W. 687, 689(9).] Section 4020, supra, authorizes a punishment ranging from five years' imprisonment to death, "at the option of the court or jury assessing the punishment." In State v. Copeland (Mo.), 71 S. W. (2d) 746, 752(11), LEEDY, J., said: "This court has repeatedly held that the fixing of the punishment for crime is a legislative and not a judicial function, and when, as in this case, the punishment is assessed within the limits prescribed by statute, it cannot be adjudged to be excessive. . . . Adherence to such holdings, obviously sound, disposes of the question thus raised, and so the point is ruled against appellant." And State v. Alexander, 315 Mo. 199, 202(4), 285 S. W. 984, 985(4), states: "It is held no matter how severe the punishment may appear to be in a particular case it is not to be considered excessive, if within the limits of the statute." [See, also, State v. Preslar, supra; State v. Long (Mo.), 253 S. W. 729, 733(9); State v. Carroll, 333 Mo. 558, 568(16), 62 S. W. (2d) 863, 868(20).]

The foregoing disposes of all assignments in the motion for new trial briefed by appellant, and some assignments in said motion of a like nature not briefed.

X. The jurisdiction of the Circuit Court of Jackson County, Missouri, is questioned on the theory the crime was consummated in the State of Kansas. The prosecution was under Section 4020, Revised Statutes 1929 (Mo. Stat. Ann., p. 2827), in part, reading: "If any person . . . shall willfully, without lawful authority, . . . kidnap or abduct or take or carry away by any means whatever, or attempt so to do, . . . any person . . . *and* attempt or cause such . . . person . . . to be secretly confined against their will, *or* abducted for the purpose and with the intention of causing the father . . . of the person so abducted . . . to pay or offer to pay any sum as ransom . . . for the return or release of any such . . . person, . . . said person . . . so guilty of the above mentioned *acts or act*, shall, on conviction, be punished." (Italics ours.) *Or* "is a disjunctive particle that marks an alternative generally corresponding to 'either' as 'this or that.'" [46 C. J. 1124, sec. 1; State v. Combs (Mo.), 273 S. W. 1037, 1039(1); Dodd v. Independence S. & F. Co., 330 Mo. 662, 671(8), 51

S. W. (2d) 114, 118(9).] "A disjunctive conjunction coordinating two or more words or clauses each one of which in turn is regarded as excluding consideration of the other or others." [Century Dictionary.] Section 4020, insofar as here material denounces the taking or carrying away of any person and (a) the causing of such person to be secretly confined against his or her will, *or* (b) the causing of such person to be abducted for the purpose and with the intention of causing the father of such person to pay any sum as ransom for the return or release of such person. The gist of the taking or carrying away is unrestricted as to place. The evidence established a taking or carrying away in Jackson County, Missouri, for the purpose of causing the father to pay a ransom for the release of his daughter.

XI. Alleged errors with reference to the given instructions in the instant case are not before the court for review, because appellant interposed no objection or exception to the giving of any instruction in the trial court. [State v. Mosley (Mo.), 22 S. W. (2d) 784, 786; State v. Hedgepeth, 311 Mo. 452, 460(4), 278 S. W. 740, 742(6); State v. Brannum, 95 Mo. 19, 22, 8 S. W. 218, 219.] Examining this assignment, we find all objectionable instructions grouped in one clause, followed by statements to the effect that the instructions fail to require the jury to find the facts alleged in the information, are agruments, are comments on the evidence, are too long, prolix and misleading, and are peremptory. Such an assignment does not set forth in detail and with particularity in separate numbered paragraphs the specific grounds or causes for a new trial. [Sec. 3735, R. S. 1929, Mo. Stat. Ann., p. 3275.]

XII. Appellant's assignment that he has "come into the possession of some new previously undiscovered evidence which will materially aid him in his defense . . .," does not prove itself (State v. Parker, 324 Mo. 734, 741(7), 24 S. W. (2d) 1023, 1026(12)); and, unsupported by any showing in the record, is insufficient. [State v. McLaughlin, 27 Mo. 111, 112, stating the showing required and reasons therefor, and approved and followed in State v. Smith (Mo.), 247 S. W. 154, 157(2), citing cases; State v. Sherry (Mo.), 64 S. W. (2d) 238, 240(13). See, also, State v. Maness (Mo.), 19 S. W. (2d) 628, 630(7); State v. Eason, 322 Mo. 1239, 1251(9), 18 S. W. (2d) 71, 77(11).]

XIII. Appellant's assignment that the jurors on their *voir dire* examination concealed the fact they had formed an opinion on appellant's guilt or innocence is without merit. The allegation does not prove itself. There is no showing whatsoever supporting it. There is no affirmative showing when information of such alleged

opinion first reached appellant or his counsel. [See Point I, (c), supra.]

XIV. Assignments of error to the effect that the court refused certain requested instructions, quoted in the motion for new trial, without setting forth the reasons why error was committed (State v. Bailey, 320 Mo. 271, 278, 8 S. W. (2d) 57, 59(6); State v. Vigus (Mo.), 66 S. W. (2d) 854, 856(5, 6); State v. Fisher (Mo.), 46 S. W. (2d) 555, 556(2); State v. Shuls, 329 Mo. 245, 253, 44 S. W. (2d) 94, 97 (11)); that the court admitted irrelevant, imcompetent and immaterial testimony (State v. Copeland, 335 Mo. 140, 71 S. W. (2d) 746, 750(3)), without pointing out the objectionable testimony (State v. Wampler (Mo.), 58 S. W. (2d) 266, 269(6); State v. Aguelera, 326 Mo. 1205, 1215(4), 33 S. W. (2d) 901, 905(7)), and assigning reasons for its incompetency (State v. Buckner, 80 S. W. (2d) 167, and cases cited); that the verdict is against the law, against the evidence and the weight of the evidence (State v. Francis, 330 Mo. 1205, 1209(1), 52 S. W. (2d) 552, 554(1); State v. Smith (Mo.), 68 S. W. (2d) 696, 697(1); State v. Copeland (Mo.), supra (1); State v. Goodwin, 333 Mo. 168, 169, 61 S. W. (2d) 960(1); State v. Shawley, 334 Mo. 352, 375(11), 67 S. W. (2d) 74, 86(24)); that the verdict is the result of passion and prejudice on the part of the jurors (State v. Smith, supra; State v. Copeland, supra); that the verdict is erroneous; that the record is insufficient to support the judgment; and that the punishment is excessive are too general to preserve anything for review. Some of the subject matters of the foregoing alleged errors have been heretofore discussed in connection with more specific assignments.

XV. Certain errors are alleged for the first time in appellant's brief filed in this court. As such assignments are not set forth in appellant's motion for new trial, the trial court was not called upon to review its action on such issues, and we therefore disregard the complaints made only in appellant's brief. [Sec. 3735, R. S. 1929, Mo. Stat. Ann., p. 3275; State v. Harlow, 327 Mo. 231, 237(3), 37 S. W. (2d) 419, 421(3); State v. Nichols, 327 Mo. 1237, 1242(3), 39 S. W. (2d) 777, 779(3); State v. Gillman, 329 Mo. 306, 313(3), 44 S. W. (2d) 146, 149(9); State v. Whitener, 329 Mo. 838, 843, 46 S. W. (2d) 579, 581(3).]

The information charges an offense under Section 4020, supra, and the proof sufficiently substantiates the verdict of guilty. All assignments of error in appellant's motion for new trial have been reviewed. The record proper discloses no error. Accordingly, the judgment is affirmed. *Cooley* and *Westhues, CC.*, concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.

Execution set for May 10, 1935.

### ON MOTION FOR REHEARING.

PER CURIAM:—Counsel for appellant in this court did not appear in this cause in the trial court. Alleged incompetency of appellant's trial counsel is assigned as a ground for remanding the cause. No such issue was presented in the trial court and properly preserved for appellate review. Additional reasons for disallowing the contention may be found in State v. Dreher, 137 Mo. 11, 23, 38 S. W. 567, 569(2). [See, also, People v. Anderson, 239 Ill. 168, 185, 87 N. E. 917, 924(12).]

The motion for rehearing is overruled.